364 So.2d 134 (1978)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS
v.
LUTCHER & MOORE CYPRESS LUMBER CO., LTD.
No. 9044.
Court of Appeal of Louisiana, Fourth Circuit.
September 12, 1978.
Rehearing Denied November 30, 1978.
Writs Refused January 12, 1979.
*135 William W. Irwin, Jr., Johnie E. Branch, Jr., Jerry F. Davis, Bryan Miller, Baton Rouge, Jesse S. Guillot, New Orleans, for State plaintiff-appellant.
Martin, Himel, Peytavin & Nobile, John L. Peytavin, Lutcher, for defendant-appellee.
Before LEMMON, SCHOTT and BEER, JJ.
SCHOTT, Judge.
In connection with the construction of Interstate Highway 10 between New Orleans and Baton Rouge plaintiff expropriated 36.574 acres of defendant's land for the right-of-way and 119.695 acres for temporary servitude for construction purposes.
The tract from which the property was taken consists of approximately 24,000 acres south of Lake Maurepas in St. John the Baptist Parish. The highway traverses a portion of the property which extends to the south from the main body of the property with the result that some 369 acres previously contiguous to the main body of the property are now separated by the highway as can be seen by reference to a map of the property which is made part of this opinion. There is on this map a tract of approximately 608 acres south of the Interstate Highway and southwest of the main tract, which is included in the 24,000 acres of land, owned by defendant.
Defendant originally claimed severance damages to this isolated tract but the evidence did not support this claim and no real issue exists on the point.
At the outset we will address a preliminary dispute between the parties as to the number of acres owned by defendant north of the Interstate Highway after the taking. Despite plaintiff's contention that the trial judge's finding of 22,982.398 acres in the remainder north of the highway was incorrect, the record shows that interrogatories propounded to plaintiff early in the proceedings as to how many acres of defendant's land will remain north of the highway elicited an admission of "23,000 acres, more or less." This amply supports the trial judge's finding.
*136 Defendant's land is a tree swamp subject to tidal overflow. It is uninhabited and contains no improvements with the exception of a few hunting or fishing camps, some temporary roads constructed and used in the course of timber cutting operations and oil and gas exploration, and a shut-in gas well which is capable of production. It is located at the closest point about two miles north of the Airline Highway and the only access from the south before the taking was by way of a shell road adjacent to Mississippi Bayou and by way of Mississippi Bayou itself and the Reserve Relief Canal. On the east the property is adjacent to U. S. Highway 51 but is separated from it by a spoil canal running parallel to the highway.
After a trial at which some 19 witnesses testified throughout 21 trial days, filling 2167 pages of testimony, and over 230 exhibits were filed, the trial court found that the value of the property taken was $250 per acre, and he awarded defendant $9,143.50 for the 36.574 acres taken, together with $18,911.81 for the 119.695 acres upon which the temporary servitude was exercised. He based the latter award on a finding that the servitude area at $250 per acre was worth $29,923.75. He awarded defendant $50 per acre from this area for the value of the timber, deducted this figure of $5,984.75 from the value of the property, and computed an 8% Rental value on the difference for 6 ¾ years, arriving at a total award for the use of the temporary servitude of $18,911.81. The court found severance damage to the 22,982.398 acres north of the highway and awarded to defendant the sum of $574,560.00, based upon 10% of the $250 per acre value. Finally, the court awarded expert witness fees to defendant for five witnesses it employed and produced at the trial.
Plaintiff appealed and assigned error in the trial court's finding of the per acre value of defendant's land, the length of time in which the temporary servitude was exercised, the existence and amount of severance damage to the remainder of the property and defendant's entitlement to and amount of awards for expert witness fees. Defendant answered the appeal, seeking an increase in the award for the property taken as well as the value of the temporary servitude, an increase in the expert witness fees, damages for timber lost in an area south of the highway, damages for the cost of the restoration of the temporary servitude area to the condition it was in before the project began, damages for the cost of placing a gas pipeline under the highway right-of-way and a revision of the award for the property taken based upon the use of the date of the taking as April, 1972, rather than December, 1967. These issues will be discussed seriatim.

VALUE OF THE PARCEL TAKEN IN FEE SIMPLE
The date of the taking was December 6, 1967, when the clerk's receipt for the amount deposited was issued pursuant to LSA-R.S. 48:442 and title to the property became vested in the plaintiff in accordance with R.S. 48:445. The dispute over the date of the taking arose because on April 14, 1972, plaintiff filed a supplemental and amending petition in which one of the sheets constituting the plan of the property expropriated was replaced with a revised sheet. This sheet showed a revision of the control of access at and near the crossing of the highway by Mississippi Bayou, and the revisions in the engineering are located not on defendant's property but rather on property of others adjacent to defendant's. While these changes may have had some effect on the access into defendant's property by way of Mississippi Bayou or on drainage of defendant's property, these factors do not concern the taking of defendant's property but might have to do only with the amount of severance damage to which defendant may be entitled. The filing of this revised map was a simple amendment which related back to the date of the filing of the original petition in accordance with LSA-C.C.P. Art. 1153 and did not change the date of the taking from December 6, 1967.
*137 In connection with the taking plaintiff deposited in the registry of the court the sum of $10,294 in accordance with the certificate of estimate of just compensation signed by Chester A. Driggers and Max J. Derbes, Jr., the independent fee appraisers employed by the state. Driggers evaluated the property at $100 per acre and Derbes at $105 per acre. According to Driggers, the highest and best use of the land was for unmanaged timber growing and recreation uses, including camp sites and hunting sites, and according to Derbes the highest and best use was for mineral leasing and oil exploration, limited revenue from hardwood timber and recreation, as well as speculative value in case the area was ever drained.
In support of their evaluations, both appraisers relied on three sales which they believed comparable, all involving swamp land, one consisting of 14,500 acres in St. James Parish sold on May 10, 1965, for $38.57 an acre, another consisting of 1714 acres in St. John the Baptist Parish on April 20, 1965, for $43.76 an acre, and the third consisting of 18,565 acres in Assumption, Tangipahoa and Livingston Parishes on September 29, 1965, for $40.40 per acre. In connection with the first and third comparables they were adjusted for time but in each comparable the land involved had better access. The second comparable of 1714 acres in St. John the Baptist was a purchase by this defendant and the property is now a part of the remainder of defendant's property in this case.
Plaintiff also produced the testimony of Louis C. Peters, a consulting forester with extensive experience in appraising and managing swamp timber lands, who testified that the highest and best use for the property was for timber production, forestry purposes and compatible recreation uses, such as hunting, fishing, trapping and boating. Using the same three comparables as did Driggers and Derbes, he evaluated the property taken at $67.24 per acre.
Defendant called John LeJeune and Kermit Williams, both real estate appraisers. Williams testified that the highest and best use of the property was for timber growth, the mining of minerals such as clay, the possibility of a water well, and potential for residential, recreational and industrial development. He concluded that the property was worth $1,000 an acre. LeJeune thought the highest and best use of the property was for timber growing, mining hard minerals and recreational land, and he concluded that the value of defendant's property was $1100 per acre. He used many of the comparables used by Williams.
In reaching his conclusion that defendant's property was worth $250 an acre, the trial judge stated that defendant's land was similar in all respects to the property involved in State Department of Highways v. Guste, 319 So.2d 468 (La.App. 4th Cir. 1975) in which this court concluded the value of that property was $250 per acre. Both parties to the instant case have taken issue with the trial judge's reference to, use of and, reliance upon the Guste case in evaluating the property, and we believe that their position has merit under the circumstances. Nowhere in the transcript of the testimony is the Guste tract mentioned except in one isolated sentence. There was no testimony as to the nature of the Guste property or the opinion of this court concerning such property. In State, Department of Highways v. Bougere, 363 So.2d 228 (No. 8953 on the docket of this court decided this date) we held that the value of the Guste tract could not be considered as controlling even though there was some testimony about the Guste property. In the absence of any testimony concerning the Guste property or case there is no basis for its use in arriving at an opinion concerning defendant's property.
Having eliminated the Guste decision from consideration as a comparable, we are left to consider the comparable sales discussed by the experts without the benefit of *138 the trial judge's impression of those comparables. It is clear that defendant's appraisers, in arriving at their evaluations, attached a great deal of significance to the property's potential for clay mining. As the outset of its case, defendant produced the testimony of E. Paul Bercegeay, an expert in the field of chemical and petroleum engineering with knowledge of geology. He had performed some tests which indicated the presence of clay under the property taken for the highway, and based upon this study defendant's two appraisers used comparable sales of land for clay mining. On the other hand, plaintiff produced overwhelming testimony to show that the moisture content and the overburden on defendant's clay deposits made the mining of clay from defendant's property highly unlikely. The evidence demonstrated that the possibility of clay mining with attendant construction of brick factories on this property was so remote that use of comparables consisting of sales of clay mining property was not supported by the evidence. In his finding, the trial judge specifically held that the mining, manufacturing or transportation of clay products from the remainder of the land was not feasible or practical at the time of trial, and we find that the same can be said of the property taken as of December, 1967.
Some of the comparables used by Williams and LeJeune took place after the date of the taking and are disregarded for that reason. Other sales used by defendants were of properties located on highway frontage, were of higher elevations than the subject property or were otherwise dissimilar to the swamp land involved in the instant case. Defendant relied on a sale by Burgess, et als, to the City of New Orleans on December 20, 1962, for which $750 per acre was paid for 205 acres, but this property was located adjacent to the New Orleans International Airport and was apparently needed for the extension of the runway into St. Charles Parish. Its value as a comparable is questionable because of its location and its special value to the airport. Like-wise, a sale by Burgess, et als to the Louisiana Department of Highways on May 17, 1966, for 239 acres at $523 per acre, while significant, must be adjusted significantly because of its proximity to the New Orleans Airport and to railroad tracks.
Mr. Derbes testified that he had appraised this last mentioned property for the state and a portion of the sale was for damages to the remainder of the property, so that the true per acre value of the property near the Jefferson Parish line was $450 while the property near the St. Charles Parish line was $300 per acre. Considering that the subject property is considerably farther away from metropolitan New Orleans than this property a significant adjustment must be made downward from the per acre value paid for the St. Charles Parish property included in the Burgess sale.
Finally, defendant's appraisers relied on three sales in St. Charles Parish to Lila, Inc. Eliminating one which took place after the date of the taking in the instant case, the other two were sales of 4.28 acres for $1401 an acre and 7 acres for $2500 an acre, both in 1967, shortly before the taking in this case. While this property was under water, the sales were of lots located in a subdivision with dedicated streets and were clearly purchased for speculation. Considering these circumstances and the sizes of the properties they cannot be considered as comparable to the subject property.
We have attached some significance to plaintiff's comparable sale by White to Lutcher-Moore on April 29, 1965, of 1714 acres in St. John the Baptist Parish for $43.76 an acre, now a part of the remainder of the subject property. Mr. LeJeune discounted the importance of this sale because it was totally landlocked or isolated, being surrounded by lands of Lutcher-Moore, but we have concluded that it was properly considered after making adjustments for time and these factors discussed by Mr. LeJeune. Considering also the other two sales used by plaintiff's appraisers as comparables *139 and applying a substantial upward adjustment for speculative development on the basis of the testimony of defendant's president, we have concluded that the value of the property taken is the $250 per acre assigned by the trial judge on the basis of the Guste tract. This conclusion is bolstered by the testimony of LeJeune and Williams that the value of this property for timber production was in the range of $150 per acre and the jump from that figure to $1,000 to $1,100 per acre was based almost exclusively on the remote possibility that this property could be used for clay mining. Parenthetically, we note that our conclusion is consistent with the result in the Bougere case which involved property of the same type as the subject and located just a half mile to the west of the subject. The three comparable sales used by the state in this case were used by it in the Bougere case.
Defendant took issue with plaintiff's appraisers on the ground that their evaluation of this property at trial was lower than the amount represented by the initial deposit of $10,294, when computed on a per acre basis for the 36 acres taken. However, the pleadings and the answers to interrogatories filed by the plaintiff show that this deposit was made not simply for the 36 acres taken but also for an estimated temporary servitude of three years' duration, so that the amount of the deposit does approximate the value of the property as testified to by the plaintiff's appraisers.

VALUE OF TEMPORARY SERVITUDE
The first issue to be considered here is the duration of the temporary servitude. Plaintiff's contention is that the servitude extended until May 4, 1970, or two years and five months. Defendant contends that it continued until 1975, or a total duration of seven and one-half years, and the trial court found that it expired on September 9, 1974, for a duration of six and three-quarter years. The trial court's conclusion was based on an instrument filed by plaintiff with the Clerk of Court of St. John the Baptist Parish on September 13, 1974, entitled "Release of temporary servitude of right-of-way." In this document plaintiff stated:
"That portion of the project effecting the parcels referred to in the expropriation suit referred to above [this proceeding] was completed and accepted by the Department of Highways on April 28, 1970, and there is no longer any further need for temporary servitude of right-of-way for construction purposes on the parcel referred to in that petition as parcel No. 33-2-C-1, which parcel is more particularly described as follows:
'Therefore, the State of Louisiana, through the Department of Highways, does hereby release to the landowner any rights acquired by the expropriation suit referred to above insofar as parcel No. 33-2-C-1 is concerned, which parcel is more particularly described as follows . . .'
* * * * * *
"This instrument is in no way intended to affect in any way rights of the State of Louisiana, through the Department of Highways, acquired insofar as parcel No. 33-2 is concerned in the above mentioned expropriation suit. Furthermore, this instrument is not intended to prejudice the rights of any of the parties to that expropriation suit."
On May 4, 1970, plaintiff had addressed a letter to defendant stating:
"As required by the provisions of Title 48, Section 451, of the Revised Statutes of Louisiana, you are hereby notified that the Department of Highways has made its final acceptance of the construction of the highway project for which your property was expropriated."
The notice of acceptance of the project sent in May, 1970, was the signal to defendant that it had one year from that date in which to file answer contesting the amount of compensation deposited by the *140 state. In its terms the letter to defendant was clear and unequivocal. The project for construction of the embankment for the highway adjacent to the temporary servitude area was completed and accepted by the Highway Department. Defendant need only to refer back to the petition originally filed in these proceedings, together with the order of expropriation and the clerk's receipt, to know that the temporary servitude was to last only for the duration of this project. Having received this letter, defendant was entitled to take complete possession of the temporary servitude area to the exclusion of everyone including employees and agents of the Highway Department. Defendant contends that plaintiff continued to use the temporary servitude area and cites a handful of instances in which plaintiff's employees and agents may have been on the servitude area but we cannot equate these visits with a continuance of the use of the area as a temporary servitude for construction purposes. Some of the visitors were experts employed by the defendant in connection with this pending litigation and others were apparently employees who, on a few occasions, entered the area while the paving of the Interstate Highway was taking place. The facts do not show that this temporary servitude for construction purposes lasted beyond the date of the letter of acceptance in May, 1970.
The trial judge apparently based his conclusion on the filing of the document with the Clerk of Court in September, 1974, but we are unable to conclude that this filing rendered the notice of May 1970, nugatory, and somehow extended the temporary servitude for construction purposes until September, 1974. Whatever reason plaintiff had for filing this document in the record, it specifically recited that it was not intended to prejudice its rights or the rights of defendant. Since, as a matter of law the servitude was already terminated in May, 1970, we fail to see how this document could of itself extend that servitude for an additional four years.
The trial judge's method of computation of the value of the servitude is not at issue. He took the value of the 119.695 acres and from that deducted the value of timber at $50 per acre. On the remainder he computed a rental value of 8% per annum, then added back the timber value to arrive at the fair market value. Using this method, we compute the fair market value of the temporary servitude as follows: 119.695 acres at $250 per acre $29,923.75, less timber value, 119.695 acres at $50 per acre $5,984.75 for a difference of $23,939.00 annually. 8% of this value for 2-5/12 years equals $4,620.33 plus timber value of $5,984.75 for a total of $10,605.08.
There is an issue with respect to the amount of timber lost in the servitude area. Plaintiff and defendant produced timber experts who testified that they measured and estimated the value of the timber with the plaintiff's witness estimating $4,548.55 and the defendant's $16,295.00. We deem this finding to be essentially an evaluation of the credibility of these witnesses, and we will not disturb the trial judge's finding of $5,984.75 particularly in view of plaintiff's concession in brief that it will not dispute that figure.

SEVERANCE DAMAGES
In his reasons for judgment the trial judge found severance damage to the 23,000 acres north of the right-of-way by loss of access. He rejected the theory that access before and after the taking would come from Lake Maurepas and instead adopted an approach that the actual development of land in the past historically has extended from the Mississippi River on the south northward into the swamp lands. He concluded that the "loss of access has reduced the fair market value of those acres north of the highway by 10% at the very least and severance damages in that amount will be awarded" at $25 per acre or $574,560.00 (based on 22,982.398 acres).
We are unable to find support in the record for this conclusion. By reference to *141 the map of the property, which is made a part of this opinion, it can be seen that Reserve Relief Canal running from the lake to the south divides the property approximately in half. All of the evidence with respect to access from the south centered around this canal, Mississippi Bayou to the west and a shell road which had run along the bank of Mississippi Bayou into defendant's property north of the Interstate and west of the Reserve Canal until the project was completed, at which time the shell road was blocked at the Interstate. Although this shell road was a private road over the property of others it did provide some overland access to the western portion of the property. On the other hand, the only access to the eastern half of the property was by Reserve Relief Canal from the south, the waterway along Highway 51 on the east and Lake Maurepas on the north. The fact that this eastern portion was not damaged by a loss of access was agreed to by all of the appraisers. Neither of the plaintiffs' appraisers assigned any damage whatsoever to the north remainder for lack of access, nor did Mr. LeJeune for the defendant. Mr. Williams, defendant's other appraiser, assigned $20 per acre damage for loss of access to the western half of the north remainder, but no such damage to the eastern half.
Therefore, we have readily concluded that any severance damage for loss of access to the north remainder must be limited to the western half of the property, but we have also concluded that defendant did not carry its burden to prove entitlement to damages for this entire northwest remainder.
In the first place, Williams was unable to provide a sound basis for assigning $20 per acre damage for loss of access to this entire tract of some 11,623.7 acres west of the Reserve Relief Canal. When asked to break down his $20 figure he stated that this was "a lump-sum judgment factor" based on "the fact that the land would be considerably more difficult to utilize whatever use it would be put to and that a knowledgeable buyer would take that into consideration in buying." He admitted that he used no sales data in arriving at his conclusion that the property had suffered a $20 diminution in value per acre.
Because of the size and location of this property we are unable to conclude logically that loss of access from the south has somehow uniformly diminished its value on a per acre basis. Anyone wishing to gain access to the property on or near the shore of Lake Maurepas (Sections 12, 13, 14, 21, 22 and 23) would surely utilize the lake for such access. This condition is unchanged by the construction of the highway. Access to the extreme northwest portion (Sections 15, 16, 19 and 20) is likewise unchanged because such access was and is by way of Bayou Tent, Dutch Bayou and Mississippi Bayou. Several witnesses expressed this view which seems obvious while Mr. Williams offered no testimony which would tend to dispute it.
On the other hand, the evidence does support an award of severance damages in some amount for loss by southern portions of defendant's property of any possible access to existing developments and traffic arteries south of the tract. It was established that before the project the road on the bank of Mississippi Bayou extended from Airline from Airline Highway into Section 33. The blockage of this road by the Interstate has undoubtedly caused some damage to Section 33 as well as 84, and would lend support to Williams' theory of $20 per acre at least for these and nearby sections.
In the Bougere case, we reasoned that the north half of that property sustained some diminution in value as a result of the expropriation because it was left surrounded by uninhabitable swamp for many miles to the north, west and east with no possibility of access to the south where there seemed to be some reasonable possibility of development. The experts there seemed to agree that a willing purchaser would pay *142 more for the south remainder than for the inaccessible north remainder.
The property taken from Bougere is only one-half mile west of that taken from defendant herein. Some of the north remainder in Bougere is located in Section 32 adjacent to some of defendant's remainder. By reference to the map it can be seen that this section is divided into four parts with the first one to the west owned by Bougere, the next by defendant, the next by Bougere and the next by defendant. Having concluded that Bougere was entitled to $20 per acre for severance damage to its remainder in Section 32, we are compelled to reach the same conclusion with respect to defendant's remainder in this section. Logic requires us to extend the same result to the land in Sections 84, 33 and 34.
On the other hand, the rest of defendant's remainder, i. e., Sections 24, 25, 26, 27, 28 and 35 were considerably farther from existing developments and traffic arteries to the south and logically were not as greatly affected by loss of possible access. All of these except Section 35 are between those sections on the north which we have already concluded are virtually unaffected by the project as far as access is concerned and those to the south which we have concluded were damaged to the extent of $20 per acre. Logic requires that we award $10 per acre for damage to these sections. As to Section 35, it is over a mile away and across Mississippi Bayou from the shell road. On the other hand, on the east it is a stone's throw from the Reserve Relief Canal. Its access was and continues to be principally from the canal. We have concluded that an award of $10 for Section 35 would be logical and consistent.
We have therefore concluded that defendant is entitled to severance damage computed as follows:
North remainder of section 84 or 400 acres; Two 160 acre parcels in Section 32 or 320 acres; All of Sections 33 and 34, 640 acres each or 1280 acres; for which 2,000 acres we award severance damages of $20 per acre or $40,000.
Sections 24, 25, 26, 27 and 35, or 3200 acres, and approximately one-half of Section 28, or 320 acres, for which 3520 acres we award severance damages of $10 per acre or $35,200. Thus, the total award of $574,560.00 is reduced to $75,200.
The trial judge found that there was no damage to the remainder with respect to the exploration, production or transportation of oil and gas. Defendant produced testimony to show that they would have to expend $25,000 for the construction of a line under the highway in order to bring the gas from their field north of the Interstate to market. On the other hand, this testimony must be considered in light of other testimony that there was already a pipeline running through the north portion of the property, that a line could have been brought along the banks of the Mississippi Bayou under the bridge over the bayou thereby making the construction of a pipeline under the highway unnecessary, and that the size of the reservoir was not such as to make production economically feasible. In view of this conflicting evidence, and considering that defendant had the burden to prove this damage, we cannot say that the trial judge erred in refusing to allow this element.
Defendant has also contended that it is entitled to severance damage because of the highway's interference with clay mining north of the highway. Our conclusion that defendant was not entitled to compensation for the property taken based on improbable clay mining potential leads to the same conclusion with respect to severance damage. Defendant did not prove with legal certainty that it suffered any damage in this connection.
Other items of severance damage claimed by defendant are those for a timber devaluation zone and the cost of restoring the temporary servitude area to its pre-project condition.
The timber devaluation zone in connection with which defendant claims damages *143 was discussed by its consulting forester, Robert D. Hatcher. This area is in the part of the remainder on the south of the Interstate Highway. In effect, this witness testified that access for timber purposes was from the north, so that the property now deprived of access has suffered its timber to be worth 30% less. The position that this property to the south of the highway is damaged because of loss of access for timber purposes is inconsistent with our award for damages for loss of access to the remainder north of the property, especially considering that one of the primary uses of the property to the north is for timber purposes. Hatcher was the only witness who found any damage to the property south of the right-of-way. We have concluded that defendant did not carry its burden of proof to establish this item of damage claimed.
The procedure employed by plaintiff in connection with this project for the construction of the embankment for the highway was to remove soft organic deposits from the surface of the swamp to a depth of from 18 to 23 feet until a firm pleistocene clay deposit was reached to provide a firm support for the embankment. In order to provide an area for the disposal of this material the temporary servitude area was taken to the south of the highway for a distance of 1,000 feet and for practically the entire length of the highway through defendant's property of over 5,000 feet. After the removal of this material river sand was pumped in to back fill the area of the highway embankment with the result that the elevation was about 9.5 feet above sea level as compared to the 5 feet above sea level which originally existed in the area.
The deposit of this spoil in the temporary servitude area significantly changed the area with respect to elevation and overall environment. The trees previously present were destroyed and on that basis an award was properly made for the timber lost in this area. It is defendant's contention that it is entitled to have this area restored to its original condition by the removal of the material which was dumped in the area, and evidence was produced to establish defendant's claim of $1,000,035.00 for this work. Defendant complains that the original petition spoke simply of a temporary servitude right-of-way for construction purposes in connection with the taking and did not adequately inform it of the plaintiff's ultimate use of this property as an area where this material would be permanently deposited. However, the maps which were annexed to and made part of this original petition clearly labeled the area for "muck disposal" so that the intention from the beginning was clear and there was no deficiency in plaintiff's pleadings in this respect when they are taken as a whole.
In support of its claim for the cost of restoration of the area, defendant relies upon constitutional principles which prohibit the taking of its property without compensation and without due process. If we were to find this property was, in effect, taken by the Highway Department it seems that defendant would be entitled to no more than the value of the property which, at $250 per acre, would amount to about $30,000. On the other hand, the property was not taken but still belongs to defendant. There is ample testimony in the record to support the conclusion that the build-up of this area with the deposit of this material enhanced rather than decreased its value. It is now high and dry ground as opposed to its previous character as a water bogged swamp. One of the principal arguments for entitlement to restoration was defendant's theory that the property could be used for clay mining, but in view of our conclusion that the evidence does not support this theory no basis remains for a damage award on this point. We have concluded that the trial judge correctly disallowed this claim by defendant.

FEES OF THE EXPERT WITNESSES
Both sides complain about the trial court's award. The trial judge made the *144 following awards for defendant's expert witnesses:
Raymond D. Hodges,
 Civil Engineer $3,480.00
 Robert D. Hatcher 3,547.53
 E. Paul Bercegeay 1,800.00
 Kermit Williams 2,200.00
 John LeJeune 2,400.00
Plaintiff's position is that these figures were excessive in that they included in Hatcher's case fees of personnel employed by him, and in all the other cases time for preparation, including meetings with defendant's counsel. Plaintiff also contends that the failure of the defendant to prove its case for clay mining and Hatcher's timber devaluation zone, along with other items, means that the testimony in support of the items did not provide a useful basis to the court for making the award and there is no basis for taxing the fees as costs.
Although defendant answered the appeal seeking an increase in each one of these awards for expert witness fees, in its brief defendant asks that the award in this respect be affirmed.
We recognize the rule that the trial judge has much discretion in fixing expert witness fees, but there is some merit to the argument that much of the time spent by Hatcher, Hodges and Bercegeay was spent in attempting to prove damages for restoration of the muck area, the timber devaluation zone, and the fixing of the property's value based upon clay mining potential respectively. Hodges was awarded $20 per hour for 174 hours of time. Hatcher $2,947.53 for his trial preparation and Bercegeay 50 hours of time in preparation. We have concluded that plaintiff is entitled to a reduction of $500 in the fees of each one of these witnesses.
Accordingly, the judgment appealed from is affirmed but amended so that there is judgment in favor of defendant, Lutcher and Moore Cypress Lumber Company and against plaintiff, the State of Louisiana through the Department of Highways, condemning and ordering plaintiff to pay to defendant:
A. The sum of $9,143.50 as the fair market value of the 36.574 acres taken in full ownership, and the sum of $10,605.08 as compensation for the use of and timber loss on the 119.695 acres on which the temporary servitude was exercised, subject to a credit of $10,894.00 with legal interest from December 6, 1967, until paid.
B. The sum of $75,200.00 as severance damage to the remainder north of the right-of-way from December 6, 1967, until paid.
C. All costs including expert fees of $2,980.00 to Raymond D. Hodges; $3,047.53 to Robert D. Hatcher; $1,300.00 to E. Paul Bercegeay; $2,200.00 to Kermit Williams; and $2,240.00 to John Le-Jeune.
AMENDED AND AFFIRMED.
BEER, J., dissents.
*145 
*146 BEER, Judge, dissenting.
Recent decisions tend to indicate that mere "severance," in and of itself, somehow sets up a sort of res ipsa basis for some liability on the part of the State Highway Department. If I am correct in this observation, I am all the more concerned about its implications  for even though the order of proof be quite different from the ordinary damage claim, there should be no basic deviation from the traditional burden of proof in these cases. Yet, the thesis seems to persist. There appears to be (at least in my view) a sort of unintended (but almost always existent) knee jerk reaction that severance damage is, somehow, automatic when the boundaries of a tract  any tract  are, in any way, violated.
The decisions, in most instances, seem to cast about for some theory which can give at least conjectural support to a severance damage claim. Such theories can  and often do  become farfetched and, thus, violate the requirements which would ordinarily be imposed to support proof of damage or loss.
In my view, one of the responsibilities of citizenship that goes hand in hand with the ownership of property is some reasonable participation with the state in its overall progressive efforts.
Thus, I accord little or no significance to the damage determining thesis that is premised in the oversimplified concept that anybody who has had their property cut through must, a fortiori, be entitled to collect severance damages from the state. That is not a valid starting point.
I believe that the starting point for the determination of severance damages should be in the form of no nonsense, straightforward evidence of loss, based, as much as possible, on sound expert or lay testimony which comes clearly and concisely to the point; and that failure to adduce such evidentiary support should precipitate the same result as failure to carry the burden of proof in any other action for damages.
The pleadings and the order of proof to be followed at the trial should, in my view, be essentially similar to those in all damage suit litigation and failure to carry the burden should precipitate the same result. I find no express or implied shifting of the burden of proof simply because property has been "severed" and, until the legislature, in its wisdom, shall so provide, I believe that the order of proof with respect to such damages should be no less intense, no more conjectural, and no more presumed than any other damage claim.
I believe that solid proof of any severance damage is little more than completely conjectural in this record and see no real support for the conceptual premise and/or the mathematical computations which have been used by the majority.
Accordingly, I respectfully, though vigorously, dissent from that portion of the judgment which awards severance damages.
BEER, Judge, responding to various applications for rehearing.
I would vote to grant a rehearing, limited to the issue of whether or not Lutcher and Moore Cypress Lumber Company has carried its burden of proof with respect to establishing pertinent facts which form the basis of any award of severance damages.